Good morning. May it please the court. My name is John F. Hester Jr. I'm here with McBinnon Associates of Cary, North Carolina on behalf of petitioner Tairou. Mr. Tairou grew up in Benin, a rather conservative Muslim country in Africa about the size of Pennsylvania. Mr. Tairou in his 30s went online, already a relationship with a Frenchman online. They proceeded to not only establish a business together but started an affair as well. That affair was exposed by some of Tairou's cousins who became privy to his social activities. This resulted in Mr. Tairou being invited out of the capital and into his parents' village of where there was a village gathering where he was mocked, humiliated, struck, and threatened by a group of people including elders and those same cousins. He returned to the capital where little by little the harassment continued. There was a home invasion after which Mr. Tairou left his house. That home invasion resulted in injury to his child and an abrasion, a minor injury, to Mr. Tairou himself. The home invasion... Is it correct that I understand the record that he received two death threats? Yes, Your Honor, at least two. One was verbal, the other one also I think more direct and verbal. I think he got two during the during the village gathering. I don't believe that there were any death threats after the home invasion. I do recall that next time, well, the threat was next time his relatives would come back with a knife and and harm him. That would be the second death threat. After that point he did get knock and runs, kind of like instead of a doorbell running off, and also telephone calls, mysterious telephone calls. Those did not amount to threats but they were certainly harassment. Mr. Tairou eventually had his family moved out of their home. The IJ, for some reason, described this as being able to be relocated within Benin. That's just fine if you don't have to work or ever leave your house, if you can live by avoiding your family by hiding in your parents' house. So what happened to Yannick, that is the name of his French lover, is that he was also exposed. He was chased out of Benin. A crowd came to him after which he sought assistance from the police and from the French authorities, French representatives in Benin. They advised him to leave. In fact, country conditions and the immigration judge acknowledge that homosexuals may be arrested in Benin on pretext of homosexual acts as punishable directly. There is a pervasive system and culture of punishing people based on their activities between consenting adults. Yannick was able to flee. He fled immediately. He did not return. He and Mr. Tairou did not maintain any relationship since then. That should give the court pause and an indication for how severe and traumatic such an encounter, a group encounter, in a small African country may be. Once Yannick left, Mr. Tairou spent his time first applying for a U.S. visa and then getting visas to other African countries to build his travel credentials so that then he could get the American visa. He came to the United States and timely applied for asylum. The immigration judge found that Mr. Tairou was credible and that he had adequately corroborated his claim. However, the immigration judge did find that what Mr. Tairou suffered up until that point did not qualify as past greater likelihood of being persecuted in the future. Meanwhile, Respondent faces at least a 10% rather, I believe this court would agree, greater than a 10% likelihood of having such a violent encounter in the future, whether or not it's with his family, whether or not it's in the village, whether or not it's in the capital. There is no truly safe relocation as the immigration judge found it's rather puzzling to have somebody hiding in a house in a country in the size of Pennsylvania and call that safe relocation. Other countries in Africa that this man visited are no more safe or accepting for homosexuals. They also have significant Muslim populations and even when there are other religions they're quite conservative. This evidence was offered not extensively discussed in the country conditions but it is there for this court's reference. Mr. Tairou fears that he would be essentially pursued again by his own family members even though it's been a while since he's been in. Your family doesn't change and he has family that disagree with his lifestyle, with his preference for a French man apparently, and also with his drinking alcohol. Now while some people can get away with this in the capital, if you have an extensive conservative family this is practically harder to do. In this case Mr. Tairou already experienced a home invasion by his family. They did not give any information. In fact Yannick was already gone by the time the worst of the harassment happened. So simply stopping his liaison with Yannick was not enough. He's still going to be himself and the harassment is going to continue. The harassment will become more and more violent just as it was promised. I think the pattern of escalation is clear but unfortunately it was ignored by the immigration judge. I think that the IJ erred in not considering or apparently not adequately considering record evidence that indicate escalation. Are you consider harassment the same thing as persecution? Not at all your honor. Harassment would be if this person had just received phone calls or perhaps just received knock-and-runs. Doesn't persecution require implicit or explicit explicit government involvement? No your honor it does not. Persecution requires that the government be either unwilling or unable to help somebody who's being persecuted or harmed on account of their protected ground. And it looks even worse when the government would refuse on account of that very protected ground to help somebody. What is your best case in terms of how the petitioner demonstrated government's unwillingness to be involved? The fact that the police essentially told Yannick to leave Benin indicates that the police are either unwilling or unable to protect somebody who himself stands out bright as day in any. Yes your honor. So his situation is not really comparable. Well he was in Benin and he was engaging in a homosexual lifestyle there. I think that the treatment would be the same across the board. The fact that the police were not able to or not willing to confront the people who were confronting Yannick you know to leave Yannick alone indicates that the police are not interested in protecting somebody who's got a crowd after them on account of their social activities or sexuality. Did he contact the police in his hometown where that original assault occurred? No your honor. He went to the to the hospital after the assault. He did not contact the police. Often people who suffer persecution do not contact the police in their home country when it would be futile. In this case I think the record evidence about country conditions and the experience of Yannick indicate that futility that the petitioner felt. In this case the the government being unable or unwilling to protect Mr. Tyroot only compounds their refusal on the basis of him being gay. I think they would take him more seriously and a lot of governments that that have indecent exposure crimes under which they persecute gay people I believe that the refusal reflects their public policy in this country to to belittle, to refuse to help, to acknowledge, or to validate homosexual relations in any way. If Thank you. Good morning. Jane Schaffner for the respondent. Can you talk up just a little bit? Sure. Sorry. Thank you. The record does not compel the conclusion in this case that Mr. Tyroo experienced past harm rising to the level of persecution. Well ma'am there is circuit law that says that a death threat is sufficient and there were two death threats at least reported in this record, right? I have the record You're not familiar with the circuit law on that? I am familiar with the circuit law that a death threat can constitute persecution. Right. The record is unclear as to whether he experienced death threats. We have a declaration for which there is no original in French at page 206 to 212 of the record. We also have Mr. Tyroo's testimony before the immigration judge. During his testimony IJ found him credible, correct? He did find him credible. The facts as articulated by the immigration judge make no mention of a death threat at the encounter in the village. In fact, Mr. Tyroo testified. He testified to it. Isn't that in the record? He did not testify to having received. How is it in the record? At pages 86. What are those pages? Pages 86 to 89. What do they constitute? Are they a statement of his? It is his testimony before the immigration judge. He said that he was slapped, he was ridiculed, he was scolded, he was impugned, his family members pulled his ears. So the government's position is that he did not receive any death threats, is that correct? He did not receive a death threat in the village when his family members. I'm sorry, I'm asking you a really simple question. Is it the government's position that he did not receive any death threats? He did not showed him a knife when they were leaving his home after the encounter at his home. They said next time and showed him a knife, but he did not. Like somebody tells you they have a gun in their waistband, they said, open the jacket up and said, next time you look down at the weapon, you don't think that's a death threat. It's certainly an implicit threat. I think it's rather explicitly showing you what exactly said, what next time looks like. It's a nine millimeter and said next time. I mean, I know you're representing the, you know, the Attorney General, but we don't have to be bereft of the common sense of it. I mean, that's a threat, isn't it? A very deadly threat, isn't it? Certainly, I mean we certainly. You know, you're a U.S. Attorney, you prosecute people all the time about brandishing weapons and threatening and giving them zillions of years in prison for things like that, right? We certainly acknowledge he was threatened for the first time during his merits hearing. He claimed, although this was not in his declaration, that during his encounter with his family in the village, they threatened to cut off his penis. You don't regard that as a death threat? It's certainly a threat. It's a threat of mutilation, but it's not necessarily a fatal injury. We certainly acknowledge he was threatened. FGM cases? Yes. That's persecution, isn't it? It is. It's not, it's not, it's not fatal, but it's, we recognize that it's persecution, don't we? Absolutely. Okay, I'll make sure you're familiar with that. And I could ask you one more question at the beginning of your brief, that you don't make any contention that homosexuality is not a protected class? No, not at all, no. The government concedes that, right? Correct. Okay. The, the problem here is that when reasonable minds might disagree about whether harm rises to the level of persecution, courts are required to defer to the agency. In, in, whether harm rises to the level of a persecution is a judgment call committed to agent, agency discretion. The fact that two people might disagree about whether harm rises to the level of persecution does not So, can I just go back to these incidents of whether there was or was not a death threat? As I understand, there are two possible venues where there could have been the death threat. The first is in his hometown with the group of people around him, and the second was, I guess, at his house when he was shown the knife. And we've already talked about the knife, and you think that showing him the knife and saying, this is what's going to happen to you next time, that that's not a death threat in your view, correct? It's an implicit death threat. So it is an implicit death threat. What about JA-210 when, when he says, they threatened to kill me? And that's, and that's the point I was trying to make before, that we have the declaration and we have the testimony. The, the declaration... You're, you're a trial lawyer as well as an appellate lawyer? Do you do trials as well as appeals? I do not. Uh-huh. Well, let me just tell you, as my years of a trial lawyer, your witness often says one thing, one place, and one thing, another. They don't contradict each other, but there's added information. Sometimes when they get on the stand, they decide to tell the world something they've never told you. So I'm not sure that's any indication of anything except it appears one place and not another place. I mean, he didn't say, or did he, you tell me, did he say in his testimony he did not receive any death threats? He did not deny receiving death threats. He simply didn't mention any death threats in his encounter in the village. He said what? He did not, he did not mention having received any death threats when he testified before the immigration. I did not receive death threats. That's correct. Okay, thanks. The, I'm sorry, I've lost my train of thought. No, no, no, I'm sorry, I apologize. The experiences that Mr. Tyru had in his village, at his home, the knock and runs, and the calls that he received afterward, certainly unpleasant. We would ask the court to be mindful that persecution in his extreme concept, that it does not include every sort of treatment that is regarded as offensive, that the cases that petitioner cites in his brief as examples of persecution all involve conduct far more severe, egregious than the conduct he experienced here. He started a relationship with another man in 2007. There's another man in addition to Yannick, a man named Gilles, with whom Mr. Tyru had a relationship beginning in 2007 and he claims continues to this day. There's a letter from Gilles in the record at page 160. They had a relationship from 2007 until 2013 and again going forward. Mr. Tyru's first problems occurred in August of 2013. His relationship with Gilles. He had no trouble during those six years. He also had no trouble during Yannick's first stay in Benin. Yannick was first in Benin from February of 2009 to May of 2009. No problem. His only problems occurred in August of 2014, according to his family, that Mr. Tyru had been openly affectionate with Yannick and had been drinking alcohol. Mr. Tyru had no problems again from January of 2014 until he left the country in March of 2014. Today, for the first time, Mr. Tyru's attorney says that his wife never left the house after they relocated in January of 2014. There's no record evidence to support that claim at all. She submitted a letter at, I believe, page 157. She makes no mention of whether she leaves the house, whether she doesn't leave the house. In fact, there's conflicting testimony as to whether she for the first time through counsel that a crowd chased Yannick out of Benin. There's simply no record evidence whatsoever to support that claim. All we know is that Mr. Tyru testified at pages 97 to 99 that two policemen came to Yannick's home, told him he'd been denounced, period. They did not arrest him. There's no testimony that he was threatened. There's no testimony that he experienced any violence. Mr. Tyru's declaration said that Yannick spent a few days at the French Embassy. There's no indication that the French Embassy advised him to leave, encouraged him to flee for his life. Mr. Tyru also alleges today that began. Let me back up just a second because I'm admittedly confused a little bit at this point. Does the government concede at this point that threats of death were made? Is that what I understood your exchange with Judge Motz and Judge Gregory? That the showing of the knife and the explicit threat were made were sufficient to rise to a level of a threat of death? We recognize that the court has held that death threats constitute, can constitute, persecution. We recognize that brandishing the knife is an implicit threat. We would still argue that cumulatively his experiences did not given other cases where individuals have experienced far worse treatment. Okay, we can always find cases where people have experienced far worse treatment than the matter before the court. And I'm still not quite clear on the government's position here. When the knife was brandished, was that at least an implicit threat of death? An implicit threat, correct. And is that enough to come within the four circuits precedent? We acknowledge that the Fourth Circuit has held that death threats can constitute persecution. Cumulative, we don't believe that what Mr. Tyru experienced here constitute persecution. When we look at all the events cumulatively, he maintained a homosexual lifestyle from 2007 to 2014 and had two specific encounters over that many year period. And after relocating with his family, never had any other problems while continuing to maintain a relationship with another man, not Yannick. If the court concludes that he did experience past harm rising to the level of persecution, we would ask you to remand to the agency to determine whether that persecution was by persons the government is unable or unwilling to control. That is not an issue the agency made an explicit finding on. I'm sorry. That is what? I couldn't quite hear you. Sure. That is, we would, if you conclude that he experienced past harm rising to the level of persecution, we would argue that remand is required for the agency to find in the first instance whether that harm was inflicted by persons the government is unable or unwilling to control. Was there any finding by that, by the IJ? There was no finding. So yes, that would be appropriate. Sure. Right. An additional finding the IJ may need to make upon remand is whether there are changed country conditions or whether any presumption of a well-founded fear can be rebutted. Well, it sounds like you wouldn't have an objection to us remanding this case with proper consideration as past persecution presumption and then weighing, as you said, other matters as police protection in every regard. Right. Obviously, we would prefer that you rule in our favor today. But it sounds like that's what you're saying. Am I wrong about it? If it has to go back, if we if we don't have a majority and it has to go back, then we would we would ask that it go back for that issue and other issues, the unwilling or unwilling to control and the well-founded fear issue. I believe the die is cast, but I would like to say on the well-founded fear. I suppose no one said that a Rubicon is visible at this point or cross. I guess you want to deal with the Latin and do your Caesar. I appreciate that. And I'd like to make the just very quickly address that. The the immigration judge did in his decision consider the fact that Mr. Tyree's son was hospitalized. We would note that this case is different from many of the cases cited in Petitioner's Brief because there's no indication that Mr. Tyree's cousins intended to harm his son. He Mr. Tyree admits it page ninety for the record that it was an accident that his son got in the way. It was not like so many cases where a persecutor intends to harm the victim by harming a family member. As I mentioned, there's there's no testimony in the record at all about what hiding means. This is for you. If the brandishing of the knife can be construed as a threat of death, and it sounds like I don't want clean words in your mouth. What would you point to as the best fact to mitigate that threat, if there is one in this record? That the cousins the cousins said, if you continue in this path next time, although Mr. Tyree discontinued his relationship with Yannick, he continued a relationship with Gilles, notwithstanding his cousin's threats. He never saw his cousins again after the August 2013 encounter in his home. Is there any evidence in this record that they were aware of the other friend? There's no evidence whether they were aware or not aware. There is of no moment then that the next time didn't occur, because that was still a secret. But the one that was open and obvious, it ended because he went back to France. It's a non sequitur argument in that regard, because there's no basis for it in terms of Go ahead. Also a point we would argue is mitigating factor. Mr. Tyree testified that he came out to his wife in 2009. She admitted to him at that time that she is also bisexual. He has said that they both have open relationships with other people. That her family is even more conservative than his family. But no one has tried to harm her. Open between we both recognize and we acknowledge it, but that doesn't necessarily mean it's in the hustings. He knows that she's lesbian and she knows that he's gay. It's open in that sense between the two of them. There's no evidence that she was around and other people knew about her relationship? We don't know what other people know about her relationship. It seems to me that you've advanced a lot of arguments that you can make. But that the IJ and the BIA can consider. But that you haven't erased what the BIA and the immigration judge did that was incorrect, which was not deal with these death threats. There's really no way you can do that. You can be a fabulous appellate lawyer, but you're stuck with the record you have, right? I am certainly stuck with the record I have. If there are no further questions, I would ask you to deny the petition. But if you are compelled to conclude, if you find that he has produced evidence that compels a conclusion contrary to the one reached by the agency, that you remand for a finding on unable or unwilling to control. One more question along that line. It seems to me you've asserted a bunch of reasons why he could be denied relief. But we have to go on the basis that the IJ came up with and the BIA. We can't go outside and find additional reasons. Correct. They found cumulatively no past harm, rise in the level of persecution, no well-founded fear. That's the rationale you're stuck with? Yes. And we would argue that the record simply doesn't compel the conclusion that he's experienced past harm. Thank you, counsel. Mr. Sess, if you think you need anything further, you can. Anything further? Anything further? Do you think you need to come further? All right, if you will. In response to the government's argument, I'd just like to submit four things for the court's consideration, which I'd like the court actually not to consider, because they're not very relevant. Not being outed for six years is not relevant. The fact that he wasn't outed during a previous relationship is not relevant. You can't unring a bell. So not having been outed in the past does nothing for a 10 percent or greater perspective of encountering violence on account of one's sexuality. The egregious conduct is to come. The government mentioned, raised the prospect of changed country conditions. There is nothing in anybody's argument up to this point to support raising that issue at all. Did you hear the dialogue which we had with your colleague? I think that was pretty clear. But of course, on remand, there can be evidence. So I'm not sure how that argument so much helps you. Yes, Your Honor. And I'll move to my final point before I finish. The government indicated that the cousins did not intend to harm Mr. Tyru's son. We're all lawyers, and we know that specific and general intent when it comes to assault, it doesn't really matter who you're after. It matters why you're doing it and whether or not you've actually assaulted somebody. The fact that the harm fell just short of Mr. Tyru is irrelevant. The harm existed. It was perpetrated. And if there's nothing further, Petitioner would humbly ask this Court to grant the petition to remand back to the agency. I thank the Court. Thank you so much, Counsel. We'll come down to recounsel and proceed to our next case.
judges: Roger L. Gregory, Diana Gribbon Motz, William L. Osteen Jr.